UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED
2019 OCT 31 P 2: 25
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| KEPRO ACQUISITIONS, INC., | ) |
| | ) |
| PLAINTIFF, | ) Civil Action No: |
| | ) |
| v. | ) 3:19-cv-842 |
| | ) |
| ANALYTICS HOLDINGS, LLC; HDI | ) |
| SOLUTIONS, LLC; AND GUY R. | ) |
| DIBENEDETTO, JR.; | ) |
| | ) |
| DEFENDANTS. | ) |

## COMPLAINT

Plaintiff KEPRO Acquisitions, Inc. ("KEPRO") alleges the following as its Complaint against Defendants Analytic Holdings, LLC, HDI Solutions, LLC, and Guy R. DiBenedetto:

### INTRODUCTION

1. This is an action to recover damages for intentional fraud and civil conspiracy to commit fraud in connection with a Securities Purchase Agreement (the "Agreement"). Under the Agreement, Plaintiff KEPRO Acquisitions, Inc. agreed to purchase from Defendant Analytics Holdings, LLC the limited liability company Health Information Designs, LLC ("the Company"). The Company's main products, representing almost 50% of the Company's revenues, are RxExplorer® and RxPert®. These two products cannot function unless they are provided access to a certain third-party database, the Progress OpenEdge database (the "OpenEdge Database"). To persuade KEPRO to purchase the Company, Defendants represented that they held a sufficient number of licenses to the OpenEdge Database to support the Company's products and customers and that those licenses could be transferred to the Company as part of the transaction. KEPRO has only recently learned (after the Agreement closed) that, in

1

reality, Defendants did not own sufficient licenses and had historically accessed the OpenEdge Database through deliberate misappropriation. As a direct result of Defendants' fraudulent misrepresentations, KEPRO has been damaged in an amount in excess of $640,000, the amount needed to obtain the required OpenEdge Database licenses.

## PARTIES

2. Plaintiff KEPRO Acquisitions, Inc. ("KEPRO") is a Pennsylvania corporation with its principal place of business located at 777 East Park Drive, Harrisburg, PA 17111.

3. Defendant Analytics Holdings, LLC ("Analytics Holdings") is a Delaware limited liability company with its principal place of business located at 1550 Pumphrey Avenue Auburn, AL 36832. Defendant DiBenedetto is the registered agent for Analytics Holdings.

4. Defendant HDI Solutions, LLC ("HDI") is an Alabama limited liability company with its principal place of business at 1550 Pumphrey Avenue Auburn, AL 36832. Defendant DiBenedetto is also the registered agent for HDI.

5. Defendant Guy R. DiBenedetto, Jr. ("DiBenedetto") is an individual residing in this District.

## JURISDICTION

6. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a).

7. The Court has personal jurisdiction over Defendants Analytics Holdings and HDI *inter alia*, because each of their respective principal places of business is in this District. The Court has personal jurisdiction over the individual defendant DiBenedetto because he resides in this District.

## VENUE

8. Venue is proper in this District because the parties' Agreement provides "any proceeding arising out of or relating to this Agreement ... shall be brought only [in the state or federal courts of Alabama]." Agreement § 9.4. Venue is proper in this District also because all Defendants are residents of this District and because a substantial part of the events giving rise to the Complaint occurred in this District.

## FACTUAL ALLEGATIONS

### A. The Securities Purchase Agreement

9. Plaintiff KEPRO is a company offering products and web-based services for healthcare management to reduce the utilization of health care resources and to optimize the quality of care for public and commercial clients.

10. On about June 12, 2018, Plaintiff KEPRO and Defendant Analytics Holdings entered into a written Securities Agreement (the "Agreement") providing for Plaintiff KEPRO's purchase of one of Analytics Holdings wholly-owned subsidiaries, namely, the limited liability company Health Information Designs, LLC ("the Company"). A copy of the Agreement is attached as Exhibit 1 to this Complaint. Copies of the Schedules and Exhibits to the Agreement are attached as Exhibit 2 to this Complaint.

11. The Company's business prior to being acquired by KEPRO involved the licensing of three distinct products known as, respectfully, RxExplorer®, RxPert®, and PA Logic.

12. The Company's RxExplorer® product and related services comprise a data collection and processing application that assists governmental entities in their auditing of Medicaid pharmacy and related medical claims data. RxExplorer® provides a pharmaceutical decision support system, including desktop access to a Medicaid prescription claims database for patient profiling,

provider (physician/pharmacist) profiling, and demographic analyses to assist in legally mandated audits. The customers of RxExplorer® consist of various state Medicaid agencies.

13. The Company's RxPert® product performs online prior authorization of pharmacy prescriptions that will be reimbursed under Medicaid. The customers of RxPert also consist of various state Medicaid agencies.

14. The Company's PA Logic product offered prior authorization services similar to RxPert, except that PA Logic was targeted primarily for use by non-governmental customers.

15. Under the Agreement, the Company would divest itself of the Company's business associated with the PA Logic product by transferring it before the closing to Defendant HDI (another wholly-owned subsidiary of Analytics Holdings). The pre-closing transfer of the PA Logic business from the Company to HDI was to be accomplished pursuant to the "Transfer, Assignment, and Assumption Agreement" attached to the Agreement as Exhibit 6.1(i).

16. Thus, the parties intended for the Company to divest its PA Logic product line and to retain the portions of the Company's business associated with the RxExplorer® and RxPert® products.

17. To enable their functions, it was absolutely essential that the RxExplorer® product and one version of the RxPert® product be provided access to a third-party database platform, namely, the OpenEdge Database offered for licensing by the Progress Software Corporation ("Progress").

18. Although HDI's business was not directly related to the Company's business, HDI offered products that also required access to the OpenEdge Database. HDI purportedly owned sufficient licenses from Progress authorizing it to access and use the OpenEdge Database to support its products as well the products of the Company. Indeed, for many years prior to the

Agreement, the Company's access to the OpenEdge Database for its RxPert® and RxExplorer® products was made available to the Company solely by the licenses purportedly owned by HDI.

19. Because access to the OpenEdge Database was essential to the functioning of the Company's RxExplorer® and RxPert® product lines, and because the licenses to the OpenEdge Database were purportedly owned by HDI, the Agreement provided that HDI would secure the transfer of sufficient OpenEdge licenses to the Company to enable full use of the Company's RxExplorer® and RxPert® products and services.

20. The transfer of the OpenEdge Database licenses (as well as the transfer of numerous other licenses owned by HDI but needed by the Company post-closing) was to be accomplished pursuant to the "Transition Services Agreement," attached to the Agreement as Exhibit 6.1(j). Pursuant to Appendix A-B to the Transition Services Agreement, HDI was to transfer to the Company the licenses necessary for RxExplorer® and RxPert® to access the OpenEdge Database.

21. The OpenEdge Database licenses were critical to the business of the Company. Without access to the OpenEdge Database, the Company would not be able to continue providing its RxExplorer® at all, and its RxPert® product would be limited to one version of the product that did not require access to the OpenEdge Database. Almost 50% of the Company's revenues were derived from products and related services fundamentally dependent upon access to the OpenEdge Database.

**B. Defendants finally disclose that they lack the ability to transfer any OpenEdge Database licenses to the Company**

22. The Agreement closed on about July 11, 2018. Plaintiff KEPRO paid Analytic Holdings in accordance with the terms of the Agreement, and Analytic Holdings transferred its ownership interest in the Company to KEPRO.

5

23. As of May 22, 2019, HDI continued to provide the Company with access to the OpenEdge Database as it had done prior to the closing. However, it failed to transfer any OpenEdge Database licenses to the Company as contemplated under the terms of the Agreement.

24. Concerned about the status of the license transfer, KEPRO wrote a letter to HDI, reminding it of its obligations under the Transition Services Agreement to transfer the OpenEdge Database licenses to the Company. *See* Exhibit 3 to Complaint.

25. On about May 31, 2019, HDI's attorney responded, asserting that HDI had tried "in good faith" to transfer the licenses, that "HDI took all actions within its control to have the license transferred" but that "this process resulted in Progress stating that its license could not be transferred to KEPRO/HID and that KEPRO/HID would need to secure its own license." HDI's attorney also represented that "HDI believes the Progress licensure issue is a matter that should cost approximately $50,000 or less to resolve." *See* Exhibit 4 to Complaint.

### C. **KEPRO learns of Defendants' apparent misappropriation of the OpenEdge Database**

26. KEPRO subsequently learned that HDI initially licensed the right to access the OpenEdge Database by purchasing licenses for use with a certain limited number of HDI customers. At some point in time years ago, HDI became aware that it was possible to use the limited number of licenses for a larger number of customers than authorized -- by essentially reinstalling the OpenEdge Database software on multiple servers. This illegitimate technique enabled HDI to violate the OpenEdge Database license agreement terms by improperly using the same license for multiple customers.

27. Without the knowledge or approval of Progress, HDI at some point years before the Agreement began implementing this technique to use the OpenEdge Database for more than the

6

authorized number of customers. Using this same technique, HDI also made available the OpenEdge Database for use with the Company's customers. In other words, HDI was breaching its license obligations with Progress by using the database beyond its authorized access rights to serve its own customers and the customers of the Company.

28. In 2017, Progress requested HDI to submit to an audit of its licenses and its access to the OpenEdge Database. HDI refused to cooperate in the audit.

29. Thereafter, Progress made repeated efforts to convince HDI to submit voluntarily to an audit. HDI refused.

30. By 2018, but before the Agreement was signed, and unbeknown to KEPRO, on information and belief, Progress had become highly suspicious about HDI's use of the OpenEdge Database and believed that HDI was intentionally breaching the OpenEdge Database license agreement between HDI and Progress and misappropriating access to avoid full payment of license fees owed to Progress. Progress repeated its request to participate in an audit. HDI provided Progress with some limited information but still refused to participate in the requested audit.

31. Instead, after the Transition Services Agreement was signed Defendants went through the entirely perfunctory exercise of "requesting" Progress to transfer the licenses to the Company. Unsurprisingly – given HDI's refusal to agree to an audit – Progress refused and pressed harder for the audit. HDI provided Progress with certain limited information but HDI continued to refuse an audit. At the same time HDI was refusing to participate in an audit with Progress, Defendants were representing to KEPRO that HDI was trying in good faith to convince Progress to transfer the licenses.

32. As noted above, Defendants finally acknowledged in its attorney's May 31, 2019 letter that none of its alleged licenses could be transferred to the Company.

### D. Defendants' Control of the Company's Representations

33. Prior to the closing the Company was a wholly-owned subsidiary of Analytics Holdings. Defendant HDI was also a wholly-owned subsidiary of Analytics Holding. Analytics Holdings, HDI, and the Company shared the same offices. Essentially all senior management of HDI was shared by the Company. DiBenedetto served as the CEO of Analytic Holdings, the CEO of Defendant HDI, and the CEO of the Company. DiBenedetto signed the Agreement, its related papers, and all the representations contained therein in three purported capacities: as the CEO of Analytics Holdings, as the CEO of HDI, and as CEO of the Company. It is therefore not possible to distinguish the representations of the Company in the Agreement from the representations of the Defendants in the Agreement.

34. Although the Agreement contained various representations and warranties purporting to be representations of "the Company," in reality, these representations were representations of Defendants DiBenedetto, Analytics Holdings, and HDI. Any representation made by the Company in the Agreement was in fact decided and controlled entirely by the Defendants.

### E. Defendants' False Representations in the Agreement

35. Numerous of Defendants' factual representations in the Agreement were materially false.

36. Defendants represented in Section 2.13(o) of the Agreement that "The Company has sufficient rights to use all Technology, including Software, computer hardware, operating systems, servers, middleware, databases, and systems, information technology equipment, and associated documentation, used or held for use in connection with the operation of the Business (the "IT Assets"), all of which rights will survive unchanged immediately after the

8

consummation of the Transactions or which will be available under the Transition Services Agreement."

37. Defendants' representation in Section 2.13(o) was false when it was made because, in reality, the Company did *not* have sufficient rights to use all Technology, and specifically, did not have sufficient rights to access the critically important OpenEdge Database. Moreover, directly contrary to Defendants' representation, the rights of the Company to access the OpenEdge software could not possibly survive unchanged after the Transition Services Agreement because, in reality, HDI had been misappropriating the OpenEdge Database from Progress for years and did not own sufficient licenses that could be transferred to the Company. It was not possible for HDI to make the licenses available to the Company under the Transition Services Agreement, again, because, in reality HDI did not own sufficient licenses to make licenses legally available to the Company via a license transfer. The falsity of the representation in Section 2.13(o) was known to Defendants when it was made.

38. Defendants further represented in Section 2.13(o) that "All IT Assets are owned or licensed under valid licenses." (IT Assets was defined in Section 2.13(o) to include, *inter alia*, software and databases used in connection with the operation of the Business.) That representation was false when made because, in reality, neither the Company nor HDI held a legally valid license to the OpenEdge Database sufficient to enable the Company to maintain its RxExplorer® and RxPert® products. The falsity of this representation was also known to Defendants when it was made.

39. Defendants represented in Section 2.13(m) that "The Company has made available to [KEPRO] all material information relating to any material problem with respect to any of the Company Products that has not been resolved."

9

40. Defendants' representation in Section 2.13(m) was false when it was made because, in reality, the Defendants had not made known to KEPRO the fact that HDI did not hold sufficient licenses for the OpenEdge Database and instead was misappropriating its access and use. Defendants had not made known to KEPRO the fact that Progress had been attempting to audit HDI's use of the OpenEdge Database but that HDI has refused to participate in the audit. As previously noted, this information was highly material, because legal and authorized access to the OpenEdge Database was absolutely essential for two of the Company's products, namely RxExplorer® and RxPert,® representing nearly 50% of the Company's revenues. Defendants knowingly withheld this material information from KEPRO, and therefore knew of the falsity of the representation in Section 2.13(m) when it was made.

41. Defendants repeated these misrepresentations in a Closing Certificate signed on July 11, 2018 by DiBenedetto in two purported capacities: as the CEO of AH Holdings and also as CEO of the Company. Defendants represented that "[t]he representations and warranties (i) of the Company contained in ARTICLE II of the Agreement [including the representations under §§ 2.13(m) and (o)] were true and correct in all material respects when made as of June 12, 2018." *See* Exhibit 5 to Complaint.

42. Defendants' representations in the July 11, 2018 Closing Certificate were false when made, because, as explained in detail above, Defendants' representations and warranties in §§ 2.13(m) and (o) in Article II of the Agreement were in reality not true when made in the Agreement, and Defendants knew they were false in the Agreement and knew they were still false in the Closing Certificate.

43. HDI fraudulently entered into the Transition Services Agreement, in which HDI agreed to transfer OpenEdge Database licenses to the Company. HDI entered the agreement

10

fraudulently because it did so with full knowledge that transferring licenses from HDI to the Company would never be possible because HDI had never paid for sufficient licenses from Progress. Defendants were unwilling to submit to an audit by Progress because they knew their misconduct would be discovered by Progress.

44. KEPRO reasonably relied upon Defendants' representations and Defendants expected and knew that KEPRO would rely upon their representations. The Agreement provided that KEPRO would purchase the Company from Analytics Holdings "[i]n reliance upon the representations, warranties, covenants and agreements set forth herein...." KEPRO would not have entered into the Agreement without Defendants' representations in the agreement, including without limitation Defendants' representations in §§ 2.13(m) and (o). KEPRO would not have closed the Agreement without Defendants' July 11, 2018 Closing Certificate. Before HDI's attorney's letter on May 29, 2019, KEPRO had no reason to believe that it had been defrauded.

45. With full knowledge that HDI held insufficient OpenEdge Database licenses to transfer to the Company, Defendants nevertheless made the misrepresentations in Sections 2.13(m) and (o) of the Agreement; entered into the Transition Services Agreement without the ability or the intent to perform, and delivered the Closing Certificate repeating their prior misrepresentations.

46. KEPRO has since learned from Progress that because of HDI's historical misappropriation of the OpenEdge Database (rather than legally securing the requisite number of licenses that could be transferred), KEPRO will be required to pay Progress at least $640,000 to acquire new licenses needed to support its customers for RxExplorer® and RxPert®.

## COUNT I
## COMMON LAW FRAUD

47. Plaintiff KEPRO incorporates by reference the allegations in paragraphs 1 – 46, above.

48. Defendants made the false representations of material facts on the specific dates and times, and in the specific manner set forth in detail above.

49. Defendants made such representations knowing they were false.

50. To the extent such misrepresentations were purportedly made to KEPRO by the Company, all Defendants participated in, controlled, and directed the Company to make such misrepresentations with illicit intent, knowing that the Company's representations were material and false.

51. Defendants made the misrepresentations intending KEPRO to rely on them.

52. KEPRO reasonably relied upon the Defendants and the Company's misrepresentations.

53. As a direct and proximate result of Defendants' fraud, KEPRO suffered actual damages in an amount exceeding $640,000.

54. Defendants consciously and deliberately engaged in oppression, fraud, wantonness, or malice with regard to KEPRO, entitling KEPRO to recover punitive damages.

55. Defendants' fraudulent behavior was egregious, gross, and oppressive, with the intent to benefit Defendants to the detriment and harm of KEPRO. KEPRO is therefore entitled to recover its reasonable attorneys fees and expenses of litigation.

## COUNT II
## CIVIL CONSPIRACY

56. Plaintiff KEPRO incorporates by reference the allegations in paragraphs 1 – 55, above.

57. Defendants Analytics Holdings, HDI, and DiBenedetto conspired and reached an understanding among themselves to defraud DePRO in connection with the Agreement by intentionally misrepresenting material facts and by directing and causing the Company to misrepresent material facts to KEPRO.

58. As a direct result of Defendants' conspiracy to defraud KEPRO, KEPRO suffered actual damages.

59. Defendants are jointly and severally liable for their respective acts and the acts of each of the co-conspirators in furtherance of the conspiracy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff KEPRO requests the Court to enter judgment in its favor against Defendants and to enter an order for the following relief:

a) An award of KEPRO's damages incurred as a direct and proximate result of Defendants' fraudulent conduct, in an amount to be proven at trial but in excess of $640,000;

b) An award of punitive damages in an amount to be proven at trial;

c) An award of KEPRO's reasonable attorneys fees and costs of litigation;

d) An order holding Defendants jointly and severally liable; and

e) An order granting KEPRO any further or additional relief, legal or equitable, that this Court deems just and proper.

[signatures continued on following page]

[signatures continued from prior page]

Respectfully submitted,

William F. Long
(pro hac vice application pending)
Georgia Bar No. 457490
SMITH GAMBRELL & RUSSELL LLP
Promenade, Suite 3100
1230 Peachtree Street NE
Atlanta, Georgia 30309
Tel. 404-815-3559
Fax 404-685-6859

Peter M. Crofton
(Alabama Bar No. ASB-4586-R67P)
SMITH GAMBRELL & RUSSELL LLP
Promenade, Suite 3100
1230 Peachtree Street NE
Atlanta, Georgia 30309
Tel. 404-815-3559
Fax 404-685-6859