IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KEPRO ACQUISITIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-842-ALB |
| | ) | |
| ANALYTICS HOLDINGS, LLC, | ) | |
| HDI SOLUTIONS, LLC, and | ) | |
| GUY R. DiBENEDETTO, JR., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on Defendants Analytics Holdings, LLC;
HDI Solutions, LLC; and Guy R. DiBenedetto, Jr.'s Motion to Dismiss. (Doc. 15).
Upon consideration, the motion is DENIED.

## BACKGROUND

This case is about a contract to purchase a business and its associated
intellectual property rights. The following facts are taken from the operative
complaint and are assumed to be true for the purposes of this opinion.

Plaintiff KEPRO Acquisitions, Inc. offers products and web-based services
for healthcare management to public and commercial clients. On or about July 11,
2018, KEPRO Acquisitions closed a Security Purchase Agreement (the "Purchase
Agreement") with Analytics Holdings to purchase one of its subsidiaries, Health

Information Designs, LLC (the "Subsidiary"), that licensed three distinct products: RxExplorer®, RxPert®, and PA Logic. (Doc. 1 ¶¶ 9–11). The Purchase Agreement is governed by Delaware law and contains a Survival Clause which requires any claims related to the contractual representations to be brought within 180 days of closing. The Purchase Agreement also contains Non-Reliance Provisions which state that the parties were relying solely on the representations and warranties contained within the Purchase Agreement.

As agreed, and before the Purchase Agreement closed, the subsidiary transferred its PA Logic-associated business to a second Analytics Holdings subsidiary, HDI Solutions, LLC ("HDI Solutions"). The Subsidiary owned the licenses, but under the Transition Services Agreement (the "Transition Agreement"), which governed the post-closing transfer of the Subsidiary-owned licenses, HDI Solutions used the licenses. The two products owned by the Subsidiary, RxExplorer® and RxPert®, function by accessing a third-party database called OpenEdge Database, licensed from Progress Software Corporation ("Progress"). Without these licenses, the products cannot function. While under the control of HDI Solutions, the two products used Subsidiary-owned licenses to access the database. (Doc. 1 ¶¶ 15–21).

On or about June 11, 2018, Guy R. DiBenedetto, Jr. signed the Closing Certificate in his capacity as CEO of the Subsidiary and Analytics Holdings, the

Purchase Agreement closed, and Analytics Holdings transferred its ownership interests in the Subsidiary to KEPRO Acquisitions. (Doc. 1 ¶ 22).

A little over six months after the Agreement closed, KEPRO Acquisitions asked HDI Solutions about the transfer of the licenses. HDI Solutions responded that according to Progress, the licenses were non-transferable. (Doc. 1 ¶ 25). KEPRO Acquisitions alleges that it entered the Agreement only because Defendants had represented that they held a sufficient number of licenses to support RxExplorer® and RxPert® and that those licenses were transferable. KEPRO Acquisitions further alleges that Defendants did not own sufficient licenses and had instead accessed the OpenEdge Database through deliberate misappropriation. (Doc. ¶¶ 26–32). KEPRO Acquisitions filed suit for common law fraud and civil conspiracy, seeking the $640,000 necessary to obtain its own OpenEdge Database licenses.

## DISCUSSION

Defendants argue that KEPRO Acquisitions' Complaint fails to plead fraud with particularity and that, even if it were sufficiently plead, the Survival Clause and Non-Reliance Provisions would bar KEPRO Acquisitions' claims. KEPRO Acquisitions counters that pleading fraud with particularity is a low bar, which it has successfully hurdled; that the Survival Clause does not exclude fraud claims; and that the Non-Reliance Provisions expressly allow consideration of the documents to which Defendants object. The Court agrees with KEPRO Acquisitions.

3

**A. KEPRO Acquisitions Pleaded Fraud with Particularity**

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard on plaintiffs in a fraud case: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). But this requirement cannot be read in isolation from Rule 8's "short and plain statement of the claim" requirement and the plausibility standards announced in *Twombly* and *Iqbal*. Wright & Miller, 5A Fed. Prac. & Proc. §1298 (4th ed.). The degree of detail that Rule 9(b) requires "often turns on the substantive context in which the fraud is alleged to have occurred." *Id.* Essentially, the plaintiff must provide enough detail "to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading." *Id.*

In this case, the alleged fraud arose from a written contract between sophisticated parties. The Delaware Court of Chancery's approach to pleading in this context is persuasive: pleading a fraud claim based on written representations under Court of Chancery Rule 9(b)[1] is "relatively easy" because the who, where, and when are contained in the contract and the defendant's reason for fraud is inducing

---

[1] The text of Delaware Court of Chancery Rule 9(b) is substantively the same as Federal Rule 9(b). *Compare* Del. Ch. Ct. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.") *with* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

the plaintiff to enter into the contract. *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).[2] All that remains for the plaintiff is to "allege facts sufficient to support a reasonable inference that the representations were knowingly false." *Id.*

Here, KEPRO Acquisitions' fraud allegations are based on written representations in the Purchase Agreement that DiBenedetto signed. In this context, the who, what, where, and when are easily located within the contract. And based on Defendants' briefing, Defendants clearly know what they are being accused of. Because KEPRO Acquisitions' allegations rely on the written agreement, KEPRO Acquisitions' accusations need only support a reasonable inference that Defendants' representations were knowingly false. KEPRO Acquisitions has done so.

Defendants object that allegations in the following areas by KEPRO Acquisitions are unclear: the Pre-Purchase Representations, the Closing Representations, the Transition Agreement, and the Conspiracy claim.

First, Defendants object that they cannot tell to whom KEPRO Acquisitions is referring in its introduction: "Defendants represented that they held a sufficient number of licenses to the OpenEdge Database to support [the Subsidiary's] products

---

[2] Although the contracts in this case are governed by Delaware law, the Court applies federal pleading standards under the *Erie* doctrine. *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) ("[W]here a state employs a heightened pleading requirement, 'a federal court … should instead follow'" the Federal Rules.").

and customers and that those licenses could be transferred to [the Subsidiary]." (Doc. 1 ¶1). KEPRO Acquisitions labeled the offending paragraph "Introduction" in bold type. The detailed allegations are found later on in the Complaint under the "Factual Allegations" heading. Defendants' argument is meritless.

Second, HDI Solutions argues that only the Subsidiary and Analytics Holdings were parties to the Closing Certificate Representations, so HDI Solutions cannot be held legally responsible for any fraud in these representations. HDI Solutions' argument is flawed on both substantive and procedural grounds. Under Delaware substantive law, any misrepresentation signed by a corporate officer in his official capacity is imputed to that officer personally and to the corporate entities for which the officer is signing. *Prairie Capital*, 132 A.2d at 59–60. Further, representations made by a company being acquired are legally imputed to related individuals and entities who knowingly influenced that company's misrepresentations. *Id.* at 60–61. So, either DiBenedetto's official signature is imputed to him and to Analytics Holdings and HDI Solutions as their CEO, or the representations made by the Subsidiary are imputed to the individuals and entities who knowingly influenced its misrepresentations: Analytics Holdings, HDI Solutions, and DiBenedetto. Either way, HDI Solutions' fate is legally tied to the Subsidiary and Analytics Holdings.

As for the Eleventh Circuit's procedural pleading requirements, a plaintiff need not plead a principal's fraudulent misrepresentation if the principal's agent made the misrepresentation. *Ackerman v. Nw. Mut. Life. Ins. Co.*, 172 F.3d 467, 471 (11th Cir. 1999). So, to plead fraudulent misrepresentation by the principals, *i.e.*, Analytics Holdings and HDI Solutions, KEPRO Acquisitions need only plead their agent DiBenedetto's fraudulent misrepresentation. KEPRO Acquisitions meets this pleading standard by alleging that "[a]ny representation made by [the Subsidiary] in the Agreement was in fact decided and controlled entirely by the Defendants." (Doc. 1 ¶ 34). And "[t]o the extent such misrepresentations were purportedly made to KEPRO by [the Subsidiary], all Defendants participated in, controlled, and directed [the Subsidiary] to make such misrepresentations with illicit intent, knowing that [the Subsidiary]'s representations were material and false." (Doc. 1 ¶ 50). These allegations are sufficient to plead DiBenedetto's fraudulent misrepresentation.

Third, Defendants object that KEPRO Acquisitions has not pointed to a specific provision of the Transition Agreement that required HDI Solutions to transfer the OpenEdge Database licenses. In fact, Defendants argue, the Transition Agreement provided by KEPRO Acquisitions in Exhibit 2 does not reference the transfer of such licenses at all. However, the Complaint states that "[p]ursuant to Appendix A-B to the [Transition Agreement], HDI was to transfer to [the

Subsidiary] the licenses necessary for RxExplorer® and RxPert® to access the OpenEdge Database." (Doc. 1 ¶ 20).

KEPRO Acquisitions has sufficiently pleaded that the Transition Agreement required transfer of the OpenEdge Database licenses for two reasons. After KEPRO Acquisitions told HDI Solutions that Appendix A-B of the Transition Agreement required transfer of the licenses, (Doc. 1-3 at 2), HDI Solutions admitted that both HDI Solutions and KEPRO Acquisitions had a "good faith belief" that the licenses would be transferrable. (Doc. 1-4 at 2). And in KEPRO Acquisitions' Complaint, KEPRO Acquisitions noted that Appendix A-B to the Transition Agreement explicitly mentions the OpenEdge Database licenses. Doc. 1 ¶ 20). Defendants later attached to their reply a complete version of the Transition Agreement which included Appendix A-B. (Doc. 25-1). So, Defendants either knew what document KEPRO Acquisitions was referencing at the time of the correspondence between their counsel and KEPRO Acquisitions', or they knew when they filed a copy of the Transition Agreement and Appendix A-B.

Fourth, Defendants argue that KEPRO Acquisitions' has not sufficiently pleaded its conspiracy claim and that the conspiracy claim rises or falls with KEPRO Acquisitions' underlying claims. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) ("[W]here a conspiracy claim alleges that two or more

parties agreed to commit fraud, the plaintiff must also plead this act with specificity."). KEPRO Acquisitions has sufficiently plead the conspiracy.

Because KEPRO Acquisitions' underlying claims survive, its conspiracy claim survives as well. In Delaware, "civil conspiracy is not an independent cause of action"; it must arise from an underlying wrong. *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998). This underlying wrong can be as simple as committing a "tortious act in concert with [an]other or pursuant to a common design …." *Prairie Capital*, 132 A.3d at 63 (quoting Restatement (Second) of Torts § 876). Generally, corporations cannot conspire with their subsidiaries, lest "every breach of contract, tort or other case involving a controlled subsidiary … become a vehicle to sue controllers." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1040 (Del. Ch. 2006). But for every general rule, there is an exception: in some cases, "[t]he fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme." *Id.* at 1044. One such case is when entities lack common economic interests to the point a corporation diverts value from a subsidiary to enrich itself. As for corporate managers, they generally cannot conspire with their corporation, unless they act for their own personal financial gain rather than for the benefit of the corporation. *Id.* at 1045 n.63.

Here, KEPRO Acquisitions alleges that Defendants committed fraud in concert with one another: DiBenedetto signed the Purchase Agreement on behalf of Analytics Holdings and the Subsidiary and the Transition Agreement on behalf of the Subsidiary and HDI Holdings, despite knowing that it operated with misappropriated OpenEdge Database licenses which could not be transferred to KEPRO Acquisitions. Essentially, KEPRO Acquisitions alleges that Defendants conspired with each other and with the Subsidiary to deprive it of its most valuable assets before transferring it to KEPRO Acquisitions. As for DiBenedetto, KEPRO Acquisitions alleges that he acted for his own personal financial gain because he secured new compensation under an employment contract with the Subsidiary without having to give up his position as CEO of Analytics Holdings and HDI Solutions. (Docs. 1-1 § 6.1(h), 1-2 at 58–70).

From the Defendants' briefing, it is apparent that they know exactly what KEPRO Acquisitions is referencing in its Complaint regarding the Pre-Purchase Representations, the Closing Representations, the Transition Agreement, and the Conspiracy. KEPRO Acquisitions has met the Rule 9(b) standard and Defendants understand what they are being accused of.

## B. Non-Reliance Provision

The Agreement contains a Non-Reliance Provision in Section 4.11, which states that the parties are sophisticated, have been given access to the documents

necessary to make an informed decision, have relied solely on their own investigation and the representations in the Agreement, and that no representations or warranties exist beyond those in the Agreement and Closing Certificate. Defendants argue that these provisions prevent KEPRO Acquisitions from relying on the Pre-Purchase Representations and the Transition Agreement Representations.

First, Defendants allege that the Pre-Purchase Representations described in Paragraph 1 of the Complaint are barred by the Non-Reliance Provisions because they are outside the scope of the Agreement. But, as noted above, the Pre-Purchase Representations are merely shorthand for the representations detailed more specifically in the body of the Complaint. The Complaint's introduction cannot be separated from the Complaint's body, which alleges in Paragraph 36 that "Defendants represented in § 2.13(o) of the Agreement that '[the Subsidiary] has sufficient rights to use all … databases … all of which rights will survive unchanged immediately after the consummation of the Transactions or which will be available under the Transition Services Agreement.'" (Doc. 1-1 § 2.13(o)). Because the Pre-Purchase Representations were part of the Agreement, the Non-Reliance Provisions are inapplicable.

Second, Defendants argue that the Transition Agreement Representations are barred by the Non-Reliance Provisions in Section 4.10, 4.11, and 9.6 because they are outside the scope of the Agreement. Again, these provisions limit the parties'

11

reliance to the Agreement and any Closing Certificate. The Closing Certificate states that all representations in the Agreement were true and correct and that the Subsidiary and Analytics Holdings had performed all of the required obligations. (Doc. 1-5 at 2). So, by signing the closing certificate, DiBenedetto affirmed that all representations in the Agreement were true and correct, including Section 2.13(o), which represented that sufficient licenses would be available under the Transition Agreement.

Nothing in the Non-Reliance Provisions bars KEPRO Acquisitions from relying on the Pre-Purchase and Transition Agreement Representations; in fact, the Non-Reliance Provisions expressly allow KEPRO Acquisitions to rely on these representations.

## C. Survival Clause

The Agreement also includes a Survival Clause, which requires certain claims to be filed within 180 days of closing. (Doc. 1-1 § 8.1). But the Survival Clause includes an exception for fraud: "Except as provided in this Section … [n]o [party] shall bring any claim after the Closing with respect to this Agreement or the Transactions, whether in contract, tort or otherwise, other than … a claim for … common law fraud against the party who committed such fraud…." (Doc. 1-1 § 8.7). So, the Agreement expressly excludes KEPRO Acquisitions' fraud claim and fraud-dependent conspiracy claim. Under Delaware law, courts will honor a bargained-for

carve-out for fraud. *ENI Holdings, LLC v. KBR Grp. Holdings, LLC*, 2013 WL 6186326, at \*15–16 (Del. Ch. Nov. 27, 2013) (fraud claim allowed because of contractual carve-out for fraud); *GRT, Inc. v. Marathon GTF Tech., LTD*, 2011 WL 2682898, at \*13 (Del. Ch. July 11, 2011) (fraud claim excluded because no contractual carve-out for fraud). Regardless, Delaware courts will generally not enforce a survival clause in the face of fraud. *Id.* at \*13 n.68; *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) ("[A] perpetrator of fraud cannot close the lips of his innocent victim by getting him blindly to agree in advance not to complain against it."), *aff'd RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118–19 (Del. 2012).

Defendants also argue that KEPRO Acquisitions is attempting to bootstrap a breach of contract claim into a fraud claim. When it comes to bootstrapping, Delaware law follows the old aphorism "You can put lipstick on a pig, but it's still a pig." Or, in more technical terms, a plaintiff cannot convert a breach of contract claim into a fraud claim merely by "adding the term 'fraudulently induced' to a complaint or alleging that the defendant never intended to comply with the agreement …." *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at \*17 (Del. Ch. Dec. 30, 2010). Here, at least at this stage of the proceedings, KEPRO Acquisitions has not merely dressed up a homely hog. It may be a different story at summary judgment or trial, but the complaint's allegations of fraud are sufficiently

13

different from a breach-of-contract claim that they are excluded from the 180-day limitations period.

## CONCLUSION

The Motion to Dismiss is DENIED, and the Court's previous stay of discovery, (Doc. 29), is LIFTED. Defendants shall file an Answer to the Complaint by April 22, 2020.

**DONE** and **ORDERED** this 1st day of April 2020.

              _____/s/ Andrew L. Brasher_____
              ANDREW L. BRASHER
              UNITED STATES DISTRICT JUDGE